**BOIES SCHILLER FLEXNER LLP**
Joshua I. Schiller (SBN 330653)
jischiller@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6800
Facsimile: (415) 293-6899

*Counsel for Plaintiff Julia Bois*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JULIA BOIS,<br><br>            Plaintiff,<br><br>    v.<br><br>LEVI STRAUSS & CO., STACY DOREN, *in her individual capacity, and* LAUREN UCHRIN, *in her individual capacity*,<br><br>            Defendants. | Case No. 3:23-cv-2772<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Julia Bois ("Ms. Bois" or "Plaintiff"), by and through her attorneys, Boies Schiller Flexner LLP, brings this action against Defendants Levi Strauss & Co. ("Company" or "LS&Co."), Stacy Doren ("Ms. Doren"), individually, and Lauren Uchrin ("Ms. Uchrin"), individually, (collectively, "Defendants"). Plaintiff alleges as follows based upon her personal knowledge with respect to her owns acts or acts taking place in her presence, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. For years, Ms. Bois was a dedicated LS&Co. employee. She excelled at her work, dutifully contributed to the company's successes, and received glowing reviews for her performance.

2. Rather than reward her efforts, the Company chose to pass her over for promotion time and again. For more than three years, Ms. Bois was lied to, manipulated, and subjected to psychological abuse by her LS&Co. supervisors.

3. For example, when Ms. Bois's manager—Defendant Stacy Doren—discussed the recently vacated position for the Senior Director of Latin America, despite Ms. Bois's years of dutiful and exemplary service to the Company, Ms. Doren said that the company "cannot put [her] down there because [she is] a woman." And, indeed, Ms. Bois was not aware that LS&Co. had ever put a woman in the Senior Director position for Latin America or Mexico. Instead, Ms. Doren told Ms. Bois to take on certain responsibilities or accept specific lateral transfers within the Company because either those positions were in line to be elevated or would help her develop the skills that her managers insisted Ms. Bois needed for a promotion. This was not true.

4. After acceding to her manager's instructions, Ms. Bois learned that instead of considering her for a promotion—as she had been led to believe—LS&Co. had instead promoted someone who had not worked for the Company in years. When Ms. Bois asked her manager why she was not promoted as discussed, her manager informed Ms. Bois—who was pregnant at the time—that the company wanted someone with greater "work capacity" (a poorly veiled reference to her pregnancy).

5.     Thus, time and again, her managers would promise her advancement, only to award any open positions to people who were younger, who were not women, and/or who were not pregnant. At other times, her managers evinced patently discriminatory staffing philosophies.

6.     As LS&Co. continued to lie to Ms. Bois about potential promotions, the company increased her workload and made her report to an ever-increasing list of senior-level managers, all while requiring Ms. Bois to rebuild and retrain the teams that LS&Co. had downsized less than a year before. Ms. Bois took the increasing workload and structural changes in stride, continuing to receive exemplary reviews for her work and performance. But ultimately, LS&Co.'s behavior had begun taking its toll.

7.     The constant lies and deceit began affecting Ms. Bois's life outside of work, too. She developed worsening symptoms of depression and anxiety as well as low self-esteem and feelings of inadequacy, which—eventually—resulted in an eating disorder severe enough that it caused her family alarm.

8.     Ultimately, Ms. Bois could no longer tolerate the Company's lies and the hostile work environment to which she was being subjected on a near daily basis. As a result, in early 2023, Ms. Bois was forced by LS&Co.'s treatment to resign from the company.

## PARTIES

9.     Plaintiff is a woman over the age of forty and former employee of LS&Co. within the meaning of all the applicable statutes. Plaintiff currently resides in San Francisco, California.

10.    Defendant LS&Co. is incorporated in the state of Delaware with its principal place of business in San Francisco, California. Throughout the relevant period, LS&Co. had more than fifteen (15) employees. During all relevant times, LS&Co. was Ms. Bois's employer within the meaning of Title VII, the ADEA, the California Fair Employment and Housing Act, and the California Equal Pay Act.

11.    Defendant Stacy Doren was Ms. Bois's immediate supervisor until May 2021, after which she was the supervisor of Defendant Lauren Uchrin.

12.    Defendant Lauren Uchrin took on Ms. Bois's prior role as Director, Consumer Marketing when Ms. Bois made the lateral move to Director of US Retail Marketing. In 2021, she

was promoted to Senior Director, Brand and Retail Marketing and became Ms. Bois's immediate supervisor.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over Ms. Bois's Title VII and ADEA claims, pursuant to 28 U.S.C. § 1331, because the Title VII and ADEA claims arise out of statutes of the United States.

14. This Court has supplemental jurisdiction over Ms. Bois's claims under the California Fair Employment and Housing Act and the California Equal Pay Act, pursuant to 28 U.S.C. § 1367(a), because these claims are so closely related to her Title VII and ADEA claims that they form part of the same case or controversy under Article III of the United States Constitution.

15. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2), because Defendants reside in San Francisco, California, and because a substantial part of the events giving rise to Ms. Bois's claims occurred in this District.

16. On March 8, 2023, Ms. Bois filed a Charge of Discrimination ("the Charge") with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of age, pregnancy, and sex, and the Charge was cross-filed with the California Civil Rights Department. Plaintiff received a Notice of Right to Sue from the EEOC on March 14, 2023.

## FACTUAL ALLEGATIONS

**A.   Julia Bois's Career at LS&Co. Stagnated Despite Five Years of Excellent Performance.**

17. LS&Co. hired Julia Bois in 2012 as Manager, Global Marketing. In 2014, she was promoted to Senior Manager, US Brand Marketing. In 2017, Ms. Bois was further elevated to Director, US Consumer Marketing, at which point her career with the Company stagnated due to LS&Co.'s discriminatory practices.

18. In Ms. Bois's role as Director, US Consumer Marketing, two men held senior positions above her. One, the Director, Brand and Retail, left after two and half years in that role. His replacement, the Senior Director, Brand (including PR, but not retail), lasted only for half a year.

19. This second man was replaced after his behavior became so egregious that Ms. Bois and her team—who were left to deal with the Senior Director's loathsome behavior—reported him to HR. After he left, Ms. Bois absorbed all his non-PR responsibilities and scope of work. However, despite taking on this additional work, Ms. Bois was told that her position was not a "Senior Director position"—meaning she could not become a Senior Director while holding her role (which now required her to perform most of the work that had just been done by someone who had held the position of "Senior Director").

20. In November 2019, her manager, Stacy Doren, offered her a lateral move to Director, US Retail Marketing. Ms. Bois was hesitant to move into a lateral role, as all but one of her peers had already been promoted to Senior Director in their current roles.

21. Ms. Doren also explained that the man who had occupied the Director, US Retail Marketing position before Ms. Bois (and whose vacating of that role opened it as a possible lateral move for Ms. Bois) was going to become the new Senior Director, Latin America. Ms. Bois was told that the only reason she was not considered for the Senior Director of Latin America position was because she was a woman: Ms. Doren specifically told her, in no uncertain terms, that "I cannot put you down there because you are a woman." This, unfortunately, was in line with LS&Co.'s existing practices, as Ms. Bois was not aware of any woman who had been put in the Senior Director position for Latin America or Mexico. Thus, while this statement may have been meant as a means of reassuring Ms. Bois about her own growth, it had the opposite effect.

22. Still feeling hesitant about the lateral position, Ms. Bois proposed that the Company create a unified Brand and Retail role like LS&Co. had before (albeit at the "Senior Director" level given Ms. Bois's level and experience). Ms. Bois explained that she could move into that position as she already had experience shouldering the necessary responsibility. Her manager, however, stated that with the growth of the Retail sector the Company needed someone who could fully focus on the retail aspect of the business and so it would not be creating the dual-responsibility role Ms. Bois had proposed.

23. As for the offered lateral opportunity, LS&Co. management explained to Ms. Bois that the lateral position was more likely than her current role to be elevated to senior director after

a year or so due to the anticipated growth of the company's retail operations. Ms. Bois's manager, Ms. Doren, also told her that the position would provide significant "channel experience" (*i.e.*, it would give Ms. Bois experience with leading marketing efforts for distribution channels), which would further enhance her chances for growth within LS&Co. Ms. Doren specifically told Ms. Bois that "by this time next year," the two of them would likely be discussing her elevation. Feeling reassured that the lateral move would not harm her career with the Company, Ms. Bois accepted the position of Director, US Retail Marketing in late 2019.

24. Ms. Bois excelled in her new role, receiving a Korn Ferry 360 review that people inside the company generally saw as meaning that the employee (in this case, Ms. Bois) was to be considered for promotion to senior level. She also received outstanding internal reviews, including a "Great" rating for her work in the Retail position (a score indicative of excellent performance and that the reviewed employee is to be promoted). Her performance was so noteworthy that the Company's leadership recognized her work with multiple excellence awards, including the Haas Award—the highest form of recognition that LS&Co. can bestow on one of its employees. Additionally, in her first year as Director, US Retail Marketing, she was elected to attend "The HOW Institute for Society: Moral Leadership Program" by LS&Co.'s Executive Leadership team.

25. But while LS&Co. management and the industry were outwardly celebrating Ms. Bois's success, the internal reality was different.

**B.    LS&Co. Discriminated Against Julia Bois Because of Her Sex, Her Pregnancy, and Her Age.**

26. After Ms. Bois made the lateral move, Lauren Uchrin took on her prior role of Director, Consumer Marketing.

27. Ms. Uchrin had joined LS&Co. approximately six months before Ms. Bois in 2012. For a while they worked together on the same team but were subsequently split up when Ms. Uchrin joined the Global Marketing team and Ms. Bois joined the US Marketing team. Then, in late 2017, Ms. Uchrin left LS&Co. to work at a beauty products company. She specifically returned to LS&Co. in order to take on Ms. Bois's former position (a decision which Ms. Bois encouraged her to make at the time).

-6-

28. In January 2021, approximately one year into her role as Director, US Retail Marketing, Ms. Bois followed up with Ms. Doren about whether there were any plans to elevate her role at LS&Co., as had been discussed with Ms. Bois prior to her accepting the lateral move. In response, Ms. Doren asked for additional time to provide a concrete answer due to the Company's then-ongoing internal restructuring and reorganization efforts.

29. Several months later, in April 2021, Ms. Bois notified her manager that she was pregnant with her second child.

30. Just one month after Ms. Bois informed Ms. Doren of her pregnancy, Ms. Doren informed Ms. Bois that Ms. Uchrin was being promoted to Senior Director, Brand and Retail Marketing. Ms. Bois's position, in turn, was being moved under Ms. Uchrin's, meaning that her former co-worker (and someone who had not worked at LS&Co. for approximately two years before her return) was now Ms. Bois's new boss. Worse, Ms. Uchrin lacked "channel experience," the very quality that Ms. Bois was told was *necessary* for elevation. Additionally, while Ms. Uchrin had children, they were significantly older than Ms. Bois's. Ms. Bois's lateral move had been encouraged—and sold to her—as a means for faster elevation, but her manager had misled her (a fact that she would later admit).

31. Instead, Ms. Bois now had a new layer—Ms. Uchrin—between herself and her former manager, the Vice President, Marketing, which meant she now had less visibility and input into important business-related conversations and decisions. The impact of this was felt almost immediately as Ms. Doren, who was still Ms. Bois's manager, began working closely with Ms. Uchrin and started pushing back or outright cancelling her standing bi-weekly and monthly meetings between Ms. Doren and Ms. Bois.

32. Ms. Bois asked Ms. Doren, her (now former) manager why Ms. Uchrin was elevated. In response, Ms. Doren asked about Ms. Bois's "360 review," noting that when the review came back, they would discuss it together and that it would provide some "clarity." And while Ms. Doren was mostly noncommittal during this conversation, later, in a moment of candor during a separate discussion, Ms. Doren mentioned that the decision was related to "work capacity." Ms. Bois understood that this referred to her pregnancy, then-upcoming maternity leave, and subsequent need

-7-

COMPLAINT

to raise an infant. It could mean nothing else, since in the preceding year Ms. Bois had shown her capacity for work by continuing to perform at a high level despite losing two managers from her team (leaving her with a team of one) and being elected to the HOW Institute by LS&Co.'s Executive Leadership team (which was a time commitment in and of itself).

33. Ms. Bois further asked Ms. Doren about what the expectations were for how she would work with and report to Ms. Uchrin and how it would impact her working relationship with her current manager, Ms. Doren. Ms. Doren did not know. In the short term, however, she told Ms. Bois to simply transition everything to Ms. Uchrin given that Ms. Bois was going on maternity leave.

34. In a subsequent conversation with Ms. Uchrin, Ms. Bois congratulated her former co-worker-turned-manager on her promotion and asked about the structural changes. In response. Ms. Uchrin encouraged Ms. Bois to take her maternity leave and reevaluate her options, telling her: "you have to get out of here, find something else."

35. Ultimately, the Company chose to promote Ms. Uchrin instead of Ms. Bois because Ms. Bois was pregnant and Ms. Uchrin was not—Ms. Bois had been with the Company longer, had amply demonstrated her qualifications for promotion, and had the necessary experience to take on additional responsibility; Ms. Uchrin had none of those things.

36. Worse, as Ms. Bois discussed Ms. Uchrin's promotion to Senior Director, Brand and Retail Marketing, it became apparent that LS&Co. *had* created the dual-responsibility role that Ms. Bois had proposed as an alternative to taking on the lateral move in late 2019. For all Ms. Doren's talk about needing someone to focus specifically on the retail business, when it came time to find *some way* to promote Ms. Uchrin over Ms. Bois, the Company ultimately chose to do what Ms. Bois had been assured they would not do: they created the new position and filled it with someone (Ms. Uchrin) who had *zero* LS&Co. retail experience instead of the person (Ms. Bois) who had been doing the job for more than a year already.

37. Feeling distraught and demoralized, Ms. Bois chose to take her maternity leave sooner than she had initially planned.

**C.     More People Promoted and More Lies Told in 2022.**

38.     Ms. Bois's son was born in August 2021, and she returned to work in December 2021.

39.     In May 2022, her (now) boss's boss—Ms. Stacy Doren—told her that the role of Senior Director, Wholesale had recently been vacated when the woman who had held that position left the company. Ms. Doren expressed interest, but was also hesitant as the position would require her to join another team so soon after the last reorganization; she had just started to establish her team under Ms. Uchrin. Nonetheless, Ms. Bois told Ms. Doren that she was interested and could interview for the position if it was the right thing to do for her family.  With that, Ms. Bois asked for the formal details about the position, and meanwhile encouraged Ms. Doren to continue interviewing others for the role.  Ms. Bois and Ms. Doren also agreed that, before filling the role, Ms. Doren would ask Ms. Bois one more time whether she wished to interview for the position.

40.     Ms. Bois never heard back from Ms. Doren about the position—not even as to the formal details she had requested.  Several months later, Ms. Bois found out why: As it turned out, in July 2022, Ms. Doren had simply rehired the former Director, Wholesale into her old position—except with a title bump. The announcement of this rehiring had been circulated via email to everyone on the marketing team (which Ms. Bois was a part of) *except* for Ms. Bois.

41.     In September 2022, a member of Ms. Bois's team told her that someone on the e-commerce team had been promoted from Manager to Senior Manager. After congratulating the newly promoted employee, Ms. Bois looked at the Company records to see who else—if anyone— had recently been promoted. Through this searching, Ms. Bois learned that two other employees (Director, Loyalty & CRM, and Director, Search & SEO) had both been promoted recently to Senior Director. As with the first employee Ms. Bois had heard about, her team had worked closely with each of the newly promoted employees. Notably, none of the promoted employees had been Directors for as long as Ms. Bois.

42.     After learning of this recent spate of promotions, Ms. Bois contacted her manager, Ms. Uchrin. During their subsequent conversation, Ms. Bois confessed to Ms. Uchrin that she felt as though LS&Co. was simply waiting for her to quit given that she was being passed up again and

again for promotion in favor of other, younger, and less experienced employees. Ms. Uchrin responded that this was not the case, stated that Ms. Doren just needed to advocate harder for her team, and suggested that Ms. Bois reach out to the Company's Chief Marketing Officer about the situation. Ms. Uchrin also said that she would speak with the CMO (Karen Riley Grant) on Ms. Bois's behalf.

43. Acting on Ms. Uchrin's advice, Ms. Bois set up a meeting with Ms. Grant to discuss the subject of promotion within LS&Co., as that issue concerned not only herself but also other members of her team. During this discussion, Ms. Grant stated that many things were in development to help people map their careers and ensure that there were consistent criteria across different teams to determine performance and career trajectories. As for the two promotions to Senior Director that Ms. Bois had found: Ms. Bois was told that they were "not supposed to have gone through."

44. In a conversation with Ms. Uchrin shortly after her meeting with Ms. Grant, Ms. Bois noted that while the CMO's information was appreciated, she still felt as though she had been given the run around. Ms. Uchrin, in turn, expressed empathy and said she would bring up Ms. Bois's concerns during the next quarterly update with Ms. Grant, which was a few weeks away. Ms. Bois never heard any follow-up specifically about whether they had any such conversation.

45. Then, in early November 2022, during their weekly one-on-one discussion, Ms. Uchrin said that as part of the upcoming Annual Performance Review process, she would be submitting elevation requests for a man on Ms. Bois's team, a woman on another team, and one for Ms. Bois as well. As part of this process, Ms. Uchrin needed Ms. Bois to fill out an updated elevation form for the man; Ms. Uchrin said that she would fill out the forms for Ms. Bois's elevation request herself. By the end of November, when Ms. Bois had submitted her team member's form, she had not heard anything further on her form from Ms. Uchrin. Ms. Bois would not know what actually happened until February 2023.

**D.   LS&Co.'s Treatment of Ms. Bois Causes Her Psychological and Physical Harm**

46. The Company's treatment of Ms. Bois did not just affect her work environment, it also took a toll on Ms. Bois's mental and physical health.

47. What Ms. Bois at first perceived to be her failure to be promoted began manifesting in feelings of inadequacy and self-esteem issues. As the pattern of her managers' conduct began to emerge, however, and as it became clear that LS&Co. was simply lying to her, Ms. Bois also began to experience worsening depression and feelings of anxiety.

48. Eventually, the Company's constant gaslighting caused Ms. Bois to develop an eating disorder, which was so severe that her family began to notice her rapid (and alarming) weight loss, which only reinforced the negative feelings caused by LS&Co.'s actions.

**E.  The Last Straw: Ms. Bois Had No Choice but to Resign from LS&Co.**

49. In early January 2023, Ms. Uchrin notified Ms. Bois via email that the promotion for the man on her team had been approved. She said nothing with regards to Ms. Bois's proposed elevation.

50. Then, in early February 2023 (a week or two prior to employee performance reviews), Ms. Bois asked Ms. Uchrin for an impromptu meeting. Due to her ongoing anxiety about work, her career, and the disparate treatment she had been subjected to (not to mention the string of lies and disappointments from her managers since 2019), Ms. Bois's weight had dramatically decreased; she was down to 100 pounds at this time, and her extended family was extremely concerned and wanted to make sure she prioritized her health at any cost. As someone Ms. Bois considered a friend, as well as her manager, she wanted Ms. Uchrin to be aware of these concerns— she did not want it to impact her work, and she was tentatively considering a short leave (a matter of weeks). Ms. Uchrin emphatically reassured Ms. Bois about her work not being impacted, that she was going to get a fabulous review in the coming weeks, and that all her peer feedback was extremely positive and complimentary. Ms. Uchrin said that the one thing Ms. Bois could confidently not worry about was her work reputation.

51. A week or two later, Ms. Bois received her review. Sharing her screen and showing the document, Ms. Uchrin showed Ms. Bois that she had received a "Great" rating (which is equal to exceeding expectations and overdelivering). This was the third time in her six years as a Director that Ms. Bois had received this rating. Ms. Bois and Ms. Uchrin then went through the particulars of the review, with Ms. Uchrin pointing out that one area of growth indicated was with regard to

1  follow-through. Ms. Bois wholeheartedly agreed, pointing out that in part the problem stemmed
2  from her feeling that no matter what she did or how much she delivered, it did not seem to impact
3  her career at LS&Co. However, Ms. Bois noted that with her new team in place for nearly a year,
4  she felt inspired and invigorated and more motivated than she had in the past two years. The
5  conversation then proceeded to discussing the financial aspects of her team.

6  52.  With minutes left in the call, Ms. Bois realized that Ms. Uchrin had said nothing
7  about elevation, nor did she intend to say anything. So, Ms. Bois did.

8  53.  Ms. Bois said that she expected to be promoted. In response, Ms. Uchrin acted as
9  though they had never had a conversation about the topic and that Ms. Uchrin had been caught off
10 guard. She told Ms. Bois that Director was the level of her role right now and that she had very little
11 confidence that the level of Ms. Bois's role would be elevated by the next year. In response, Ms.
12 Bois expressed her extreme distress and frustration given how long she had been strung along,
13 believing that anyone at LS&Co. had her best interest and growth in mind. Ms. Bois pointed out
14 that Ms. Doren had told her when she originally approached her with this position that it would
15 likely be elevated quickly (and now Ms. Bois had to tell this to the person who not only had taken
16 over her old role but also been promoted above her).

17 54.  A few days later, Ms. Bois asked Ms. Uchrin if she could send Ms. Bois's
18 compensation statement as well as the job description and elevation form she had submitted for Ms.
19 Bois's position so that Ms. Bois could try and understand the justification for not elevating her role
20 based on the scope of work alone (as clearly, based on her most recent review, performance was
21 not the issue). Ms. Uchrin immediately replied with Ms. Bois's compensation statement and
22 expressed confusion about what elevation form Ms. Bois was asking for. In response, Ms. Bois
23 reminded her that when she had asked Ms. Bois to create the elevation form for Ms. Bois's team
24 member, Ms. Uchrin had said she was creating the form for Ms. Bois as well. Ms. Bois saw Ms.
25 Uchrin twice in person following that email; at no point did Ms. Uchrin acknowledge this issue.

26 55.  Twenty-four hours later, Ms. Bois followed up expressing her extreme confusion
27 and need for clarity, noting that it was occupying her thoughts. After exchanging emails in an
28 unsuccessful attempt to find time to talk, Ms. Uchrin let Ms. Bois know that she was sorry if she

created a misunderstanding that she was submitting the elevation form. According to Ms. Uchrin, she had not received approval to do so, but really wanted to submit it now. She reiterated that getting approval to promote someone to Senior Director was not easy.

56. The last email on the subject that Ms. Bois received from Ms. Uchrin asked when Ms. Bois would be ready to talk, attempted to apologize for the situation, and reinforced that getting approval for a Senior Director promotion is much harder than a lower-level employee.

57. However, Ms. Bois knows of at least eight colleagues who—with one exception—had been in a Director role for less time or equal time to Ms. Bois that had been promoted to Senior Director in the last three years, including people that her former manager, Stacy Doren, had verbally recognized as not being qualified for the role (*e.g.*, could not manage a budget), but have made other contributions that caused the company to overlook those shortcomings.

**F.     Conclusion**

58. The Company chose not to promote Ms. Bois under cover of re-organization at multiple points.

59. As a result of the discrimination, Ms. Bois has suffered mental distress in the form of depression, anxiety, fear, and lack of sleep.

60. As a result of the discrimination, Ms. Bois had no other choice than to resign from her employment.

61. As a direct result of the discrimination described, Ms. Bois is entitled to damages, including but not limited to, back pay, front pay, lost benefits, emotional and physical distress, mental anguish, punitive damages, and statutory attorneys' fees and costs.

**FIRST CAUSE OF ACTION**

**Discrimination on the Basis of Sex and Pregnancy in Violation of Title VII (42 U.S.C. § 2000e, et seq.)** *Against LS&Co.*

62. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

63. Defendant LS&Co. violated Title VII by discriminating against Ms. Bois in the terms and conditions of employment because of her sex and pregnancy.

64. LS&Co. violated Title VII by subjecting Ms. Bois to disparate treatment by failing to promote her time and time again because of her sex and pregnancy.

65. LS&Co.'s actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

66. Plaintiff is entitled to damages as a result of LS&Co.'s unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## SECOND CAUSE OF ACTION

**Discrimination on the Basis of Age in Violation of the ADEA (29 U.S.C. § 633(a))**

*Against LS&Co.*

67. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

68. Defendant LS&Co. violated the ADEA by discriminating against Ms. Bois in the terms and conditions of her employment on the basis of her age, as an employee over the age of forty.

69. LS&Co. violated the ADEA by subjecting Ms. Bois to disparate treatment by failing to promote her time and time again because of her age.

70. LS&Co.'s actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

71. Plaintiff is entitled to damages as a result of LS&Co.'s unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**THIRD CAUSE OF ACTION**

**Discrimination on the Basis of Sex, Age, and Pregnancy in Violation of the California Fair Employment and Housing Act ("CFEHA") (Cal. Gov. Code § 12900, *et seq.*)**

*Against All Defendants*

72. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

73. Defendants violated the CFEHA by discriminating against Ms. Bois in the terms and conditions of employment because of her sex, age, and pregnancy.

74. Defendants violated the CFEHA by subjecting Ms. Bois to disparate treatment by failing to promote her time and time again because of her sex, age, and pregnancy.

75. Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

76. Plaintiff is entitled to damages as a result of Defendants' unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**FOURTH CAUSE OF ACTION**

**Discrimination on the Basis of Sex in Violation of the California Equal Pay Act ("CEPA") (Cal. Labor Code § 1197.5)**

*Against All Defendants*

77. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

78. Defendants violated the CEPA by paying Ms. Bois less compensation for substantially similar work to her male colleagues despite her having equivalent or better skills, efforts, and responsibility performed under similar working conditions.

79. Plaintiff is entitled to damages including but not limited to the balance of the wages, including interest thereon, and an equal amount as liquidated damages, together with the costs of the suit and reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION

### Violation of Cal. Labor Code § 226(c)

*Against LS&Co.*

80. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

81. On March 8, 2023, Plaintiff's attorneys made a formal request for records pursuant to California Labor Code §§ 226, 432, and 1198.5.

82. California Labor Code § 226 requires that copies of records pertaining to employment be disclosed 21 calendar days from the date of the request.

83. Plaintiff and Plaintiff's counsel received the requested records on April 7, 2023, which was outside of the 21-day deadline.

84. Pursuant to California Labor Code § 226, Plaintiff is entitled to $750 in statutory damages for the Company's failure to comply with the disclosure deadline.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as set forth below:

1. Declaring that the acts, practices, and omissions complained of herein are unlawful and violate Title VII, the ADEA, the CFEHA, and the CEPA;

2. Awarding Plaintiff compensatory damages, including but not limited to back pay, front pay, lost benefits, emotional and physical distress, and mental anguish;

3. Awarding Plaintiff punitive damages;

4. Statutory attorneys' fees;

5. Statutory damages;

6. Pre-judgment and post-judgment interest;

7. The costs of bringing this suit, including reasonable attorneys' fees; and

8. All other relief to which Plaintiff may be entitled at law or equity.

///

///

///

# DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all issues and causes of action triable by jury.

Respectfully submitted,

Dated: June 5, 2023

By: /s/ *Joshua I. Schiller*
    Joshua I. Schiller (SBN 330653)
    jischiller@bsfllp.com
    BOIES SCHILLER FLEXNER LLP
    44 Montgomery Street, 41st Floor
    San Francisco, CA 94104
    Telephone: (415) 293-6800
    Facsimile: (415) 293-6899

*Counsel for Plaintiff Julia Bois*